And good morning, Your Honors. Dana Cole for Taryn Johnston. May it please the Court. Your Honors, the issue here is whether there's substantial evidence to support counts. Let me ask you what bothers me most about your argument on that issue so you can address it directly. The overtime. I understand your argument that she was available for work and she did whatever work they gave her. I understand your argument that she had permission to work from home. I mean, the whole thing sounds like just a real abuse of the government, but it sounds as though Taryn actually had the permission, whether it should have been granted or not. But I can understand how she could be claiming overtime if she says they didn't give me any work to speak of. I think four cases in four years. How can she be claiming overtime? And I also can't understand why, if she's working from home instead of the office, but she's taking her kid to the doctor a lot, she wouldn't be taking annual leave or sick leave. Instead, she holds on to all her leave and winds up getting paid for it, and she claims overtime on top of her regular hours. Overtime is usually when you're just assigned more work than you can do in your regular hours. Why isn't that enough for the jury to have concluded that she was just lying on her timesheets? Well, it's a legitimate question, of course, and it's sort of an elephant in the room, but the fact of the matter is the government really never isolated. I don't care now about the government and whether their prosecutor was thinking like I'm thinking, because the prosecutor isn't making the decision, the jury is. And what I want to know is why couldn't a jury have had those thoughts based on the evidence? Again, because I don't think the prosecution, and I hope I'm not straying from what you want, but the prosecution didn't really break it down and isolate it to that degree. Oh, I know that. I know you're right. It may be the prosecutor just didn't think of saying to the jury, what about the overtime? Well, they did. But there are 12 people on the jury, and they can think of it themselves. True, but it's sort of the proverbial elephant in the room. They made the case about paycheck abuse, but really the charges were a false statement. And it just seems to me that if you take your kid to the doctor or if you don't know how to access a certain program on a computer, do people really get indicted for that? I mean, isn't that really a progressive? It depends. Handing out your password when you're doing intelligence stuff, secret stuff? Well, but that was never the allegation, Your Honor. It was just literally to access her e-mail to a colleague who had then forwarded her e-mail. Feeding on your time sheets. That would get lawyers disbarred. But, you know, it frequently happens, and 99.999% of the time it's a matter of progressive discipline. It's a matter of counseling. It's not a matter of indictment. Tell me, how many lawyers do you know have been indicted for cheating on their time sheets? I cannot think of a single one. So this was a hyper-technical attempt or exercise by the government. I know two who went to prison for discovery violations. I think keeping time sheets is the curse of the legal profession. One minute of my time. Maybe they're more liberal in California about that. I don't know. Well, the fact of the matter is they – I sound like a merchant, you know. That's right, you know. I've been selling myself for so much an hour. I don't see why the jury couldn't conclude from not taking leave for taking her kid to the doctor. I mean, the jurors are going to think of that because they have to work it out with the boss when they take their kid to the doctor. And claiming overtime when she says they weren't giving me any work to do and that's why I didn't do any work. I don't see why the jury couldn't convict her on that. Okay, and I understand. But the fact of the matter is the jury was really convicting her not for the false statement because, you know, that was hyper-technical. Look at how the question was phrased to her, Your Honor. I mean, can you really put someone in custody on a question that says, have you worked all the hours on your T and A? I mean, if they're going to be hyper-technical and indict her for false statement, then at least the question that she's accused of lying about has to be a legitimate – Remind me, what does T and A stand for? Time and attendance. Time and attendance. Time and attendance, yes. Then at least the question has to be a legitimate question. If you're going to impose this type of huge criminal liability on the response, then you've got to be able to ask a correct question, and that is not a correct question. I don't see why. Because he's doing it in the singular on your time and attendance. What does that mean? Which time and attendance? Going to work. Well, but he didn't say that. In other words, I agree with you. A lot of lawyers talk more abstractly, but what we're looking at on sufficiency of the evidence is what inferences the jury could draw from the evidence that was in the record. Okay, and from a common-sense point of view, of course you're correct. But this is not a common-sense type of prosecution. What this is is a hyper-technical prosecution saying false statement. You lied when you were asked a specific question. Namely, did you work all your hours on your time and attendance? Now, you understand our argument is that under the CFR 541.602B, if you're ready, willing, and able to do the work, and her supervisors all said she was. How can she be ready, willing, and able to do the work if the crucial part of the work involved accessing this database, and hers had lapsed since 2003? Okay, but what she did when she needed to access it was simply to ask a colleague for assistance. That's what the record shows. So, again, do we really criminalize and put people in prison for not knowing how to necessarily access some sort of software where someone else is in the office who can easily do it with them, assist them, help them, whatever, and that's what the record was. The problem here is that the supervisor, when, Your Honor, you say she's not ready, willing, and able, but she is because she's always lingering out there waiting for the work from the supervisor, and the supervisor doesn't give it to her. And, therefore, what this court perhaps needs to decide is, is it her burden to seek the work? And if you don't seek the work, is she then lying, or is she telling the truth when she says, yeah, all my time was correct, but it's just that they never gave me any work. I was ready, I was willing, I was able. Pick up the phone, Madam Supervisor, tell me what you want me to do, and I'm happy to do it. But for the most part, that didn't happen. Whose fault is that? Is it the defendant's, and we put her in prison for it, or is it the supervisor's who gets a free pass? I think the supervisor for a long time was her husband, wasn't it? No, no, it wasn't. Officially, it was her husband's boss who was in a different office, something like that? Well, the chain of command perhaps was a little murky, and at some point her husband was possibly in the chain of command, but he was not her direct line supervisor who was not her second line supervisor. So he really wasn't tasking her with anything. He wasn't involved in any of her day-to-day activities whatsoever at any time. But, yes, he was a high-level supervisor in the office, but certainly having nothing to do with tasking his wife as to any assignment. The difficulty with your arguments is that all of these arguments can be made to the jury, and now that she's been convicted and we're up on appeal, we have to draw all of the inferences in favor of the government now. Again, very true. However, the problem with the jury, and that's why a lot of my appeal really dealt with the Rule 29 issue, that is because they were so incensed, I think, the way the prosecution presented it. They used this false statement as a backdoor approach to basically hang her for paycheck abuse. And so the jurors, they saw that. They saw paycheck abuse, and they weren't necessarily focused on the issue of the false statement and whether what she says technically was true or not. Now, you can fault me for being hyper-technical about whether her response technically was true or not, but they're also being hyper-technical in their prosecution by using this backdoor approach. And it just seems that whether you go to a doctor, because so many people take their kids to the doctor and they don't take time off, and if they should and they don't, that's an issue of progressive discipline. We don't indict people for that. That just doesn't seem right. They did here. Well, they did, but the question is, are we taking civil misconduct in the workplace, and are we criminalizing it? I don't know what the jury thought. All that there is for us to decide is whether there's sufficient evidence that they could have thought that she committed the crime she was charged with. Okay, but again, I understand your argument that it sounds like they're overdoing it, but I don't understand why that's an argument that has any force here. Well, but ultimately, isn't it up to the courts, whether it's our trial judge or whether it's this appellate court, to step in and say, you know what? This may be overreaching. This is going just a little too far. And we understand that the jury can look at this and apply various inferences and say, okay, you're guilty of false statement. But at some point in time, maybe a line does have to be drawn, and if technically she was ready, willing, and able, and if technically she had recanted a false statement with respect to the computer, but how often, if ever, is someone indicted for that? But instead, this is payback, no pun intended, but it's payback for the paycheck abuse. And that's what this is, and that's why we're coming to this court, and we brought our Rule 29 motion to the lower court to say, you've got to do something here. This isn't right. You can't use the backdoor approach here on something this hyper-technical. I just want to spend just a minute or two talking about this recantation issue, because, again, can the courts really premise false statement liability when you lie and then think better of it? Why can't they? Well, because people lie all the time, and then they have a moment of conscience, and they say, you know what, I'm going to come clean. It's not days later, it's not weeks later, it's not after the investigation has been materially influenced, but it's a few hours later when she makes the call and says, you know what, I want to retract what I said. Additionally, she was told that you can amend your statement, that this investigation is not complete. Respond to my questions, and then essentially think about it, and if you have additional information you want to give, you're free to do that. Okay, but that wasn't true. That wasn't true. She should have been told at the time that that interview took place. I thought the law was, and not very nice, and frankly it surprised me the first time I found out about it, but I thought the law was under 18 UFC 1001 that if you're talking with an FBI agent or some other government investigator, they could lie to you, but if you lie to them, it's a felony and you can be and often are indicted for it. You're absolutely right. That is the law. It's a very, false statement is a strict law, no question about it. But there are some safe havens with respect to it, and recantation in a reasonable time, given the facts and circumstances of the false statement, has to be viewed by the court. I thought the law under Lanos Centurios was that it had to be made before the perjurer realized that his lie has been or will be exposed, and here it was after. Well, that's only because a zillionth of a second after she said she didn't share the password, the investigator says, well, your colleague tells us otherwise. Okay, so there was literally no time to recant before he blurts out that he knows better. But what's interesting, it's a double-edged sword, because the law in false statement is that it has to influence. In order for the false statement to be material, it has to influence the investigation. So how can the government argue that they were... Capable of influencing the government. Okay, but how can they really argue that what she said or did was capable of influencing them when he had already talked to her colleague, he had already done the investigative work and learned that she had shared the logon, he told her that, and then, okay, in a moment of conscience, she decided because he told her you can always amend your record, that she decided she better do the right thing here and amend the record and recant the statement. In other words, otherwise, we are... There's a true disincentive for people to have that moment of conscience. Think about it and come forward and say, you know, what I told you wasn't exactly correct. And, you know, I want to come clean now. Again, what the government is trying to do is use cases and other circumstances, other fact patterns, and be very hyper-technical about the sword of Damocles coming down and creating criminal liability when common sense should tell us that someone should have a reasonable opportunity to recant the statement. And in this case, I would submit to the court that what she did was more than reasonable and nobody was influenced or her statement wasn't even capable of influencing this investigator. And that's why I contend that there was not substantial evidence here to support either of these convictions. Thank you very much. Thank you. May it please the court. Pamela O'Leary Tower on behalf of Defendant Appellant Frank Johnson. Just for the record, and it's in my brief, with respect to counts 1 through 23, we have adopted and we incorporate the argument made by Mr. Cole on behalf of the wife Taryn Johnson as to the materiality of the statements. Our position is that they were not material, the TNA sheets, and therefore there was a failure of proof. I'd like to move on to a more or equally important point, which is counts 26 and 27, which were the severed counts. Our position is that a grave injustice occurred during this first trial, the severed trial on 26 and 27. And while it's true that in my pleading at trial and before this court, I have used the terms prosecutorial misconduct, egregious, and phrases of that nature, after listening to arguments this morning before this court, I also say in my opening brief that the district court judge, he was wringing his hand, he was dismayed, deeply dismayed by what occurred here at the district court level. Help me with something here. You did hear this morning about even worse prosecutorial misconduct. Yes. Just bizarre behavior. But I'm not calling what I'm trying to say. I understand. Now, here's my question. When you've got a Brady issue, pure heart and empty head is no defense. The prosecutor may have a pure heart because the police didn't tell him about the exculpatory evidence or the impeaching evidence, but it's still a Brady violation. But in this case, it's really not a Brady issue. It's a straight prosecutorial misconduct issue. And on that, the judge basically said this particular prosecutor had a pure heart and an empty head. And it looks to me like that probably is a defense on prosecutorial misconduct. It's not a Brady issue. What am I missing here? I think what happened here, well, what I got from this morning's argument was, and it was my experience in trying to research and argue this unique circumstance that happened. I've been trying cases for 25 years. I have never had a prosecutor immunize one of their witnesses in the middle of testimony or before they testified. And I think what happened here Let me ask you about the immunization. You've got these lying witnesses. I can't remember their names right now. Tracy Cormier and Rex Harris. Rex Harris lied about having nothing to do with the letter, and his boss, Tracy Cormier, lied about having nothing to do with the letter. And then the e-mail chain was shown to them, and they said, oops, we lied. And Tracy Cormier did, in fact, instruct Rex, whatever his name was, to write the letter. And in order to get all this out, the prosecutor gave Rex, whatever his name was, immunity. It does strike me as kind of bizarre to give them immunity in the middle of trial. I've never seen it either. Well, no, I have seen it. It happens. It's unusual. But I'm having trouble understanding the exact nature of the misconduct. Misconduct has to be that the prosecutor is trying to get some lies out there, and the prosecutor basically says, no, I was trying to get the truth out there. I think in this case, under these circumstances, what happened was my colleague impeached with Exhibit CC Tracy Cormier. Rex Lisa and Sara Lee, which was a surprise to the government apparently, but that was a surprise to us because we got the documents. Now, with the government, I was trying to figure out how it could be a surprise, how they could have an empty head, because they had the documents before you did, as you said in your brief. And all I can figure is, well, you were about to explain. They had downloaded, as I understand it, and there was more than 20,000 pages in this case. It was a huge paper case. They could have an empty head just because they didn't read their own paper. I didn't say that. What I'm saying is that I think, first of all, it's a side issue as to whether they knew about it or not. My argument is premised upon, and they did, they didn't know about it, but they had it in their possession and they turned it over to us. So it could be they downloaded the paper, they turned it over to you without having read it. So you knew about it because you did the work. They didn't know about it because they didn't do the work. I can't say they didn't do the work. What I'm more concerned with is what happened when this all came to a head in the trial, which is we approached Exhibit CC, of course, as righteous impeachment material. We didn't see it as anything, we had no grounds to move to dismiss anything. This is righteous impeachment material. I mean, they opened to the jury saying Frank Johnson wrote this letter. Frank Johnson is guilty of this. Oh, no question. It was terrific. And so we, you know, we were just waiting, and rightfully so, as the government concedes. I don't see any gain to justice in laying blame under the circumstances of this case. What I say is that when it happened- But you have to lay blame on the prosecutors. Well, I've laid blame twice on two different individuals. One is the district court judge for not exercising his discretion and dismissing this case when this happened, pursuant to his inherent supervisory authority. That's my big position really in this, because I'll have to agree with you candidly- Wait, a mistrial would be different because it wouldn't be double jeopardy. If he dismisses, that's a big deal. That's a very difficult decision because of double jeopardy. Yes, that's correct. But difficult decisions are there to be made by trial judges. This trial judge also said on the record when this was all developing over a matter of days, actually, a colloquy between the government and the judge about what were they going to do about this and how could they in this, and that's all in the brief and in the excerpts, was that in his 21 years on the bench as an L.A. Superior Court judge and a district court judge, federal court judge, he had never seen anything like this before either. And even listening to the government's justification and their reason for, you know, we want to bring the truth to the jury, the fact is that he didn't buy it and I don't think this court should either. I think that there was manipulation. I think it's in the record. It's pretty clear. And the judge did too. In the end, there was manipulation by whom? The government. With this situation, there's manipulation. I'm a little unclear on your argument because there really is, you're treating the prosecutors and the agents kind of as a synonymous entity and, of course, in many instances they are. But it's your argument then, well, let me clarify. There's no question that the prosecutors were surprised by the testimony at trial, right? Their whole strategy indicated that they didn't know about the impeachment. So then once the impeachment evidence came out, the question is what were the AUSAs, the prosecutors, going to do about it? So what they decided to do was to immunize the witness and disavow to the jury any reliance on that witness's testimony. Exactly. And only they have the power to do that. So your argument at the back is what? That is misconduct. What you would normally do, and in the cases they cited and the other cases that I found that referenced those cases, with regards to what a prosecutor can do and how you can, you know, with these perjuring witnesses in trial, all of those cases, Becerto, beginning with Becerto, going on to Bauer and also the other one, is that those witnesses were not immunized. Their impeachment happened, and what the government did is when they found out that their witness had lied before the grand jury, for example, they came and told the court, or didn't, and then it came out. But none of those witnesses, the government did not immunize those witnesses. So those witnesses were left as they were found for the jury to- But doesn't Becerto suggest that dismissal based on perjury before the grand jury is appropriate if the prosecutors learned about that- Yes, and I'm not saying- Before the trial started, and here there doesn't seem to be any dispute that that didn't happen. It didn't happen, and I'm not saying, what I'm trying to say is that- I don't understand why it hurts the defendant and why it's misconduct to immunize Harris in the middle of the trial. If he hadn't been immunized, he would have just stuck with his lie, which was inculpating for Johnson. He didn't, first of all, the order of- I mean, Johnson's best angle here was, I had nothing to do with this letter. Tough to prove because of other evidence, but- But see, Judge Otero, he realized this. First of all, Cormier is impeached. Surprise, surprise, recess, everybody exits and they deal with it. I don't know, we weren't there. They were dealing with it. They did not have to- Harris hadn't testified yet. So two things here. We thoroughly impeached Cormier and the government's case with Cormier. We didn't need Harris because we had Exhibit CC. She had to identify it. It came into evidence. It was what it was. And it was clear that she had directed Harris to write the letter and not Mr. Johnson. So they overnight, I believe it was overnight and I can be corrected if I'm wrong, it was a while ago, came into court. Not only did they immunize him, they got him an attorney, Rex Harris. And then they came into court the next day. He was looking at perjury. He lied to the grand jury. And now he's about to lie some more or somehow get tangled up so he won't talk unless he gets immunity for talking. But how does that hurt the defense? Because in giving immunity, the government said this was their intent, was that they wanted to bring the truth. But what they were saying is they then stood up before the jury and they told Judge Otero, we're disavowing all of this testimony from Mr. Harris. We're disavowing it all. You can't trust any of it. And we're not going to ask the jury to rely on it. Well, that testimony, I wrote the letter. Those were not Frank Johnson's words. That was Harris' testimony was compelling. So what matters to you is not really the immunity. It's letting the government disavow his truthful testimony that Johnson didn't write the letter. Your problem is with the jury. Let's see. I can't remember. Were they instructed not to give any weight to his testimony that he, in fact, wrote the letter and not Johnson? That was argument. Argument I don't care about. You can argue. They can argue. No, they were instructed. They were not instructed to disregard the testimony that Harris and not Johnson wrote the letter. No, but it was made amply clear by the government. Well, the government's not the boss. The judge is. And that's my next and last final argument is that the judge being the boss and a very concerned judge throughout all of this, and I think it's pretty evident even in black and white how concerned this judge was, his solution was to, well, we'll see what the jury does. And that's unacceptable under the circumstances of this case. And then months later, in his oral ruling, to, again, go over it, express concern, but to say in the end, and this is what he says, in the end, the problem with our argument, and he said was that we had no case law directly on point. And that's why I'm referencing this morning's argument, because there is none. I couldn't find any case law that would fit the circumstance where the information, the perjury is learned after the jury is impaneled. And I could not find any case law that would directly address that issue. It's your argument, then, there's no case out there directly on point. It's your argument, then, that only dismissal will do. There's no lesser measures that the government could take to address the situation that occurred in this case? That's my argument, and I believe that with what happened here that it is a viable argument, that it is the only solution here, and that what Judge Otero was saying and suggesting to this Court is that the day has come. I mean, listening this morning as well about 2255 and 2254D and what the Supreme Court has not said yet, well, we all know there's many cases, Gideon, you know, a zillion criminal cases where the Supreme Court had not said or had said otherwise, and it just takes one court to take it up. And so there is no case law to address this situation, Your Honor. And I just think that at that point it was clear to Judge Otero that the proper way to seek justice in this case was to dismiss both of those counts. Thank you. Good morning, Your Honors. May it please the Court, Assistant United States Attorney Lawrence Middleton appearing on behalf of the United States. And I'd like to begin by addressing Defendant Frank Johnston's argument that the prosecutor's engaged in misconduct by, after learning that one of its witnesses before the grand jury may have committed perjury, immunizing that witness and calling him to testify at trial. Both in their brief and here in court today, defense cites extensively to the fact that the district court had some serious issues with what it learned about ICE as events unfold in the district court. It's very clear from the record that the court also disagreed with the government's decision to go forward once the court was convinced that a witness had testified untruthfully in the grand jury and also perhaps at trial. But, Your Honors, it's very clear that the district court recognized its authority to dismiss an indictment for due process considerations where there is egregious cross-sectoral misconduct. Help me on something here. What evidence, my impression was that the government built its case on counts 26 and 27 and on the fact that Frank Johnston wrote a letter to the Florida U.S. Attorney's Office saying to give this Syrian fellow, I can't remember his name, a deferral of the date when he had to go to prison because he was working as an informant or could be useful as an informant and he'd be more useful outside than inside. And the case was built on Frank Johnston writing the letter and then it turned out, unbeknownst to the prosecution, that Frank Johnston did not write the letter. What else did you have for the jury on counts 26 and 27 to show that Johnston was guilty of those counts? Well, Your Honor, in addition to the letter itself, there were evidence of other communications that Defendant Frank Johnston had with the defense counsel for this witness and also with the prosecutor. Could you give me some concreteness? Frank Johnston told A, X. Frank Johnston told B, Y. Frank Johnston told Cormier or Rexford, could you give me a letter to use to the U.S. Attorney's Office in Florida? Whatever. Just summarize in a list what else you've got. Your Honor, the first thing that he did was, and this came into the testimony of former U.S. Attorney Tom O'Brien, was that he, through an individual who worked for him, contacted Mr. O'Brien and asked Mr. O'Brien to contact the U.S. Attorney's Office in Florida to ask them to get involved because he had a cooperator and he wanted this individual to be able to cooperate. Now, he did that. Okay, so you have Johnston calling O'Brien. That's correct. Now, in addition to that, after he called Mr. O'Brien, and Mr. O'Brien actually went forward and contacted the U.S. Attorney's Office in Florida, in Tampa, and as a result of that, the individual's surrender date was delayed. Sometime thereafter, when it came time for this individual to surrender again, again, Mr. Johnston had someone contact U.S. Attorney, or I'm sorry, the Chief of the Criminal Division at that time, Mr. O'Brien, and asked that he would get involved to again delay the surrender date. At that time, Mr. O'Brien said he would not contact Florida unless someone gave him some more details in terms of information as to what this individual was doing. At that point, when that word got back to Mr. Johnston, rather than follow up and provide the U.S. Attorney with any additional information about what this individual who was supposedly cooperating had actually done or was doing, he decided that he would just go ahead and contact Florida himself. So it was very clear from his contacts with the U.S. Attorney's Office that he did not believe this individual was cooperating, because as the U.S. Attorney testified, he would have been more than happy to get involved if only Defendant Frank Johnston had provided him with the information that he was asking for. But rather than do that, he took matters upon himself and did not provide the U.S. Attorney with that information. So I think that in and of itself was indicative of Defendant Frank Johnston being guilty of the crimes alleged in Counts 26 and 27. In addition to that, there came a point in time when Mr. Frank Johnston's supervisor asked him to stop getting involved in this and stop trying to delay the surrender date. The supervisor at that time was named Silliman. And even after that, Defendant Frank Johnston had some additional conversations with defense counsel in an effort to delay the surrender date. Did anything come out at the trial about why Johnston is so eager to take care of this fellow in Florida? Well, Your Honor, it was never clear. And there was a lot of evidence about the fact that this individual who was supposed to surrender was part of a community in Los Angeles, and he had some friends there. One of those individuals was also a friend of Defendant Frank Johnston. And it was through this relationship that Mr. Frank Johnston got involved. In fact, there was evidence that Defendant Frank Johnston also worked for this individual in the Los Angeles community. And the person I'm referring to was someone who was also a reserve sheriff with the Sheriff's Department. So there was some relationship there, not between Defendant Frank Johnston and this supposed cooperator, but between Defendant Frank Johnston and another individual who knew the cooperator and wanted to help the cooperator to get his surrender date delayed. Now, why he did this, we don't know. There was some evidence, again, like I said, that Defendant Frank Johnston was working for this individual and getting paid by him. But there was no evidence of a quid pro quo, and this came out during the trial also. But there was clearly some evidence of financial... Was Johnston working for somebody else in addition to ICE? That is correct, Your Honor. I get it. So there was some financial entanglements that came out during the course of the trial. And again, that would be the only thing that the government could see that would be reason for his getting involved to the level that he was, because the evidence also was that someone at Defendant Frank Johnston's level would not normally get that involved in this kind of situation.  And the other thing I would say about the letter, Your Honor, is... So you're saying you had all this other evidence of the problem in addition to the letter, so there was something left to the case after the letter just got blown out of the water. Well, Your Honor, the answer to that question is yes. But, Your Honor, the government also would disagree with the notion that the letter got blown out of the water, because at the end of the day, Your Honor, the letter was signed by Defendant Frank Johnston. And so really what we had was a circumstance... Oh, you mean even though he didn't write it, he signed it. That's correct, Your Honor. And the government's position very simply would have been, we have a situation where there's a hierarchy, and Defendant Frank Johnston was at the top of that hierarchy, and it's not a... And to Cormier, and Cormier tells Harris, Frank wants this letter, you get it done. And then Harris writes it, and Cormier gives it to Johnston. That's correct, Your Honor. And Johnston signs it and sends it. That's correct, Your Honor. How I did it, I missed that. It's just not that unusual in the hierarchy for someone at an upper level to have someone below him draft the letters for his signature. And so regardless of the fact that it came out that Mr. Harris had wrote the letter, it really didn't change the government's theory of the case that much. It was just a matter of he... So he's the boss, he signed and sent the letter, and he had his underlings do the work for him, write it. That's exactly the government's theory, Your Honor. And yeah, when we started, we did believe that he had actually written it, because we weren't aware... Was he Cormier's boss? He was in the chain. I don't know if he was her direct line supervisor or not, but he was certainly above her, and there was a lot of communication between them. So he could tell her to do things. Absolutely, Your Honor. And in fact, it was Defendant Frank Johnston, according to the record, who asked Ms. Cormier to have this guy, Mr. Abood, who was the potential cooperator, have him interviewed to see if they could get him signed up as a cooperator. So there was clearly communications between the two of them about this potential cooperator. So it really didn't do that much damage to the government's theory of the case, yet it came as a surprise. Was there evidence that Johnston told Cormier to write the letter? No, we don't, Your Honor. All I'm saying is it wouldn't have changed the government's theory a whole lot, because we still would have been left with the fact that Defendant Frank Johnston signed it.  That's correct, Your Honor. He signed it, and he also faxed it. So it certainly was not a mystery to him that the letter was sent under his signature. What about the argument made by the defense that by immunizing Agent Harris and disavowing any reliance on his testimony, that somehow you've undermined all of the exculpatory value of his testimony to the defense? Your Honor, I'm not sure I understand how that can be. What the government did in this situation was it took a witness who had relevant, admissible testimony and immunized him and caused him to testify in order to get truthful information out of that witness. I am not aware of any authority for the proposition that by immunizing a witness you get relevant, admissible, truthful information. By immunizing, it was telling the jury to disregard his testimony that Johnston did not in fact write the letter he did. That didn't happen, Your Honor. The government never asked the jury to disregard his testimony to the effect that he wrote the letter, and Mr. Johnston didn't. In fact, what the government said was given the credibility issues with that witness as demonstrated by the fact that he testified under a grant of immunity, which is something that you often get in the instructions with this kind of witness, what the government said was that the jury should not use that witness's testimony against, and I emphasize the word against, the defendant. That was what the government admonished the jury. They didn't say disregarded in its entirety? They said don't use it against Johnston? It did not say that, Your Honor, and it did not suggest that. The defense was free to use Mr. Johnston's testimony for any purpose that it saw fit. All we were saying was don't use this questionable witness against this defendant. That's what the government did. And again, there's no authority whatsoever for a claim that, for a prosecutor to do something like that where it's basically saying don't use a potentially bad witness against the defendant, that that could be misconduct. And as far as, again, the law on this particular issue, obviously, and it's been alluded to already, the government wasn't aware of this letter, and the court had some questions about that and how it is that the government wasn't aware of it, and the government didn't plan to get into that, and we didn't in our briefs because it didn't seem like it was an issue when we wrote the brief. I think it may have become an issue with the defense's reply. The question was, since the government had it, the government must have known that Cormier and Harris were lying all along. And one possibility, one logical possibility, I'm not suggesting that it was a possibility here, but a logical possibility is the government knows perfectly well that Cormier and Harris are lying. They've been lying all along, but their lie is useful for us in nailing Johnston. What are we going to do about these e-mails that prove that they're lying? Well, let's give them the e-mails along with 20,000 other documents, and the odds are they'll never find them in that truckload of bankers' boxes of documents. And that's one thing that always is possible. Another thing that's possible is the government lawyers don't find them either because there's so much stuff, and the defense lawyers just happen to find the smoking gun when they do their document review. Your Honor, I think those are good theories and good arguments, but they aren't consistent with the facts and what actually happened in the case. And again, this is not part of the record because when I wrote the brief, Just explain how it could be that the government doesn't know right from the get-go that Cormier and Harris are lying. And again, it was explained in the briefing before the district court, the underlying briefing, and the court alludes to it somewhat at page 18 of the government's brief in this case. But what happened in this particular case, Your Honor, is that the government obtained an image of the defendant's hard drive in 2008 to preserve the hard drive at that time. Now, the witness who testified before the grand jury testified in 2009. The case was indicted in late 2011. The government did not get a search warrant and search that hard drive that it had imaged until early 2011. So when the witness testified before the grand jury, the government hadn't even searched the hard drive. And the government also explained in the district court, it never had the actual document. The government turned over some documents that it was able to recover from the hard drive to the defense, and it also gave the defense an image of the actual hard drive. But what happened in this case as it was explained to the district court was that in order to pull documents off of that image, the government used a keyword search. One of the words that it used to search was the word ABOOD, which was the name of the cooperator. And, Your Honor, I'm not an expert in computers, but my understanding is that when they ran the word ABOOD in an attempt to find a relevant document, it did not pull up the document that the defense was able to use to impeach the witnesses at trial. And my understanding of the reason why is because although the word ABOOD appears in that document, it's in a string of words that are all connected, and the software didn't separate that word out. So the government never actually had that document. Was there space in front of and after ABOOD? There was not, Your Honor. And, in fact, I'm looking for the document itself. It's in the defense's excerpts of records. And if I can find it, you can actually see the way the word ABOOD appears in the document at the top. And, again, this is the way it was explained, and I can't vouch for that because I really don't know, but that was the explanation that was presented as I understood it. And I apologize, Your Honor, for being told that it's on page 328. Okay, and it starts on page 327. And if you look at the top, again, it's the defense's excerpt at page 327, and at the top of it, it says, Notice AUSA, letterhead, ABOOD, dot, dot. So there's no space between letterhead and ABOOD. And, again, I'm sure there's software where you can pick that up. What if the computer is looking for letterhead ABOOD instead of ABOOD? That would be correct, Your Honor. That would be the only way that would have been picked up. So that was my understanding of how that happens. So this was not a situation where the government didn't read the document, said it recovered, or didn't attempt to pull the key documents from the software. It would be okay if they didn't read them. Empty head is a defense against misconduct. Well, again, but it's very clear, though, because of the timing in this case and the way things happened. Letterhead ABOOD and government just looked for ABOOD. That's correct. So the government never knew. And the interesting thing about this, Your Honor, is that, obviously, the defense did know. And they made a strategic decision, which the government doesn't question. Of course. I mean, if you've got the cross that's going to blow the government out of the water, you sure don't disclose it to the prosecutor. Well, and again, Unless you think the prosecutor will drop the case and you trust 100% the prosecutor's integrity, you've got to save your best ammo for the trial. Your Honor, the government doesn't question that. But then that takes us to the law, and in particular cases like Becerro. And Becerro says a due process violation occurs when a defendant is allowed to stand trial on an indictment that the prosecutor knows is based on purgent testimony, and that testimony is material, and Jeopardy! has not attached. And by delaying as it did, Jeopardy! has attached. And so it's very clear that there's no due process violation. They didn't delay anything. They did absolutely the right thing. One would have to ask whether it was ineffective assistance of counsel if they had disclosed their best material to the prosecutor before the trial. Again, Your Honor, I'm not questioning the trial tactics. All I'm saying, Your Honor, is where there's no knowledge and where the trial has actually started, Jeopardy! has attached. The only issue is whether the government knew that Harris and Cormier were lying. And what you're arguing is they didn't because we didn't find the letterhead because our computer was looking for a guy named Letterhead Abood. It wasn't looking for Cormier or Harris or Abood. Well, not only that, Your Honor, but at the time that Special Agent Harris testified before the grand jury, the hard drive hadn't even been searched. So there was no way that the government would have been aware of it at that time. The government hadn't even obtained the search warrant that ultimately led to the search of that hard drive. That didn't happen until January or so of 2011. And again, the reason for that delay, my understanding, had something to do with the litigation that was going on with the comprehensive drug testing case. And I guess there were some changes in the law as a result of that case. But factually, the government wasn't aware. And for a due process violation, the government has to know. And for that reason, there is no violation. And again, as I've previously said, there's no authority for the proposition that the government engages in misconduct when it immunizes a witness to present truthful testimony. And so unless the court has some additional questions on that, I've got about a minute and a half left, and I could address the false statement aspect of the case, particularly with Defendant Johnston, Taryn Johnston. And the one point I would make, because I don't have a lot of time to make a lot of them, and I think the court has already recognized that there's plenty of direct and circumstantial evidence in the record from which the jury could conclude that this defendant did not work the hours that she claimed she was working. But the defense suggests that this was somehow a payback for the paycheck fraud. And in fact, Your Honor, we wouldn't even be here had the witness just told the truth. There was a massive fraud in this case, as the government sees it, and this defendant was a perpetrator. When she was interviewed, the government had already decided that she was not going to be prosecuted for that fraud. It was an administrative action at that point. Her only obligation was to tell the truth. And had she told the truth, she would not have been prosecuted for the crime. She likely would have been fired, but that would have been the end of it. But instead, she made a conscious decision to not tell the truth, and that's what got us to this point. It wasn't because of any desire for payback on the part of the government. She could have taken the out that she was given, and we wouldn't be here. But given that fact, and given all of the circumstantial evidence, things like, as has been pointed out, she didn't even have access to the databases that was required for her to do her job, so she can't really say she was able. The fact that she claims overtime, and one of the things the court asked about was just how much emphasis was placed on the overtime. Well, the government introduced during the trial Exhibit No. 37, which laid out the fact that this witness was receiving substantial overtime during this time period that she was off from work. And when she was claiming, she didn't have any work to do. So the government did bring that information to the jury's attention and did emphasize it. And also, one of the things the defense talked about is the fact that she found other people to help her when she needed to do a database. Well, if your job is to be able to have access to the database, and you've got to find someone else to do it for you, that doesn't make you able to do your job. I guess the last point I would make is when we talk about this time period and whether she actually worked the hours on her time sheet, she was working from her home for more than five years. No one has been able to identify more than four projects that she worked on that entire time. All of those projects were in 2007 and 2008, the very tail end. She never even completed one of those projects. So to suggest that she worked all of the hours on her time sheet just is incredible. And I guess the last point I would make is she makes this argument that it wasn't false because she was ready, willing, and able to work, and she was entitled to her full pay so long as she was ready, willing, and able, and she had this letter authorizing her. Well, Your Honor, that's a totally different issue from whether you actually worked the hours. The question she was asked was, did you work the hours? She said no. That answer was material to the investigation that the agents were doing because they wanted to know. It was also material because if she didn't work those hours, then she should have been taking leave when she wasn't working. And there was evidence in the record that she was taking extensive leave without taking, I'm sorry, that she was away from work on medical appointments and was not taking leave. And as one of the cases the government cited from a different circuit says, leave is money. And so when the agents were asking her about whether she worked the hours, if she said no, that was not a truthful answer regardless of whether she had a letter, regardless of whether she was entitled to her full pay so long as she was ready, willing, and able, because the agents had to do additional investigation. If she said no, she wasn't working, then they had to look at her leave and see if she was accounting for that time. If she said she was working, then obviously they wouldn't have to worry about it, but it did matter to their investigation. And in fact, one of the things that they asked her also was whether she had taken medical appointments or had gone to medical appointments without taking leave, which made it very clear that her answer to that question was material to their investigation. So with that, Your Honor, unless the court has some additional questions, the government would submit. Thank you. Thank you, Your Honor. Just very quickly, Your Honors, again, the issue is not whether she worked her hours. It's whether the time and attendance records are accurate. And she said yes, not no. She said yes that, well, let me just, the specific question is, have you worked all the hours on your time and attendance? And she said yes. I think we understand that. Your opposing counsel just misspoke on that. Right. But the point is not whether she actually worked the hours, because under the labor code, if she's ready, willing, and able, you don't have to work the hours. All you have to do is be available for your supervisor to call you to say, hey, I need you to do this, I need you to do that. You just sat there for weeks and weeks waiting for the supervisor to call you. Well, technically, you can. Well, you didn't sit there. It's not right. In other words, we may all agree, hey, come on, you need to be more proactive. You need to pick up that phone and you need to call your supervisor or you need to complain to your supervisor's supervisor. But this, they've made it a crime. In other words, the question of right or wrong, the moral issue, is a whole different thing. But to make it a crime by not picking up the phone and asking for work, that to me is a different story and that's where you draw the line. And that's why I object to this prosecution. Thank you. Okay. Just briefly, Your Honor. I don't dispute that the government may not have known, had actual knowledge, that this document, Exhibit CC, existed. What our position is, is cobbling together the available case law, is that once they did find out, once we brought it to their attention by impeaching one of their key witnesses, that the only remedy was at that point to dismiss both those counts, 26 and 27. The reason I say that is because in Communist Party versus Subversive Activities Control Board, a United States Supreme Court case, and this is simply just their, it's the gestalt of the case, not the holding of the case, but the fact of the matter is, as was spoken of early this morning in another prosecutorial misconduct case, is that the prosecutor is to do justice. And what Communist Party says is that fastidious regard for the honor of the administration of justice requires the court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted. And the bottom line is that when something like this happens, and again, it's my experience that I have had witnesses, my own witnesses, immunized in the middle of trial. I have never in my experience had a government attorney immunize one of its witnesses in the middle of trial as a result of prior testimony of a different witness. This situation to me is unique in my experience. I've had them immunize them beforehand. We had them immunize them in this case in a different part of the case. But the fact is that even if the court cannot hang a dismissal on the due process challenges because the case law does not fit, and I think what the court can do is find that what happened here, regardless of the weight of the evidence, I understood your honor to be speaking, asking what else was there, but regardless of the weight of the evidence, that what happened here with respect to Harris, because we're losing sight of it, and Cormier, is that they lied to the grand jury. And that when a prosecutor is aware and becomes aware, not isn't aware, and doesn't do anything knowingly but becomes aware at some point in proceedings, even after the jury is impounded, that something very, very wrong has happened and they have the power to fix that wrong, they should do so. That was Judge Otero's feeling, and that is mine. If the prosecutor had found out that Frank Johnston was in all likelihood innocent, then I think your point would be compelling. But what he found out did not show that Frank Johnston was probably innocent. It just showed that some evidence that he thought was decisive for the prosecution was, in fact, false. Different thing. He had plenty of other evidence. He did not have direct evidence of the type that would in any way approach the power and the force of Exhibit CC and the government's Exhibit 57. And I think in a perfect world, that had they been doing their due diligence and using a better computer program, because we found it, that would have picked up the word Abud or Tuma, actually, was his last name, and Cormier and Harris, why weren't they searching? They dumped those computers. Now, their explanation at the district court level for not searching the computers, they dumped the computers pursuant to search warrant, but they sat on them or they didn't do anything. When you say dumped, you mean extracted? Pulled out, extracted. Well, they said they were relying on a case that was before the Ninth Circuit as to the propriety of certain search warrants of business computers. You're saying that after the lies to the grand jury, they got a search warrant, and they, what, made printouts or at least scanned all the information on the hard drive? They seized my client's computer. That was before, but they hadn't searched the hard drive. They did not look at the contents of the computer. Their excuse for two years, their excuse was that they were waiting for the Ninth Circuit to rule on a case that they claimed had similar attributes. The difference between that case that was on appeal. Well, this closed container issue has been around for a half century. Mr. Johnson is a government worker. They have the right to take his computers and search them at any time, and that's in the government context. But they didn't. They didn't. And then after the false testimony by Harris and Cormier, then they got a search warrant, and then they scanned the hard drive? No, no, they scanned the hard drive. They finally, finally scanned it and produced it in 2011. That's correct. We're not disputing that. You said no, and then you said that's correct. I'm trying to get the time sequence. No, what Mr. Middleton is saying, they waited a period of time. What I'm saying is that they did not have to wait that period of time. I just want to get the time sequence. I don't want to get the argument. The argument comes after I have the time sequence. 2009, they seized the computer. Okay. Two years go by until they feel comfortable enough to get a search warrant and execute it on that very computer. Let me put the question, because I keep getting argumentative rhetoric, and it confuses me. I'm just trying to get the sequence. The sequence is, first, they take the computer. Then Harris and Cormier lie to the grand jury. No, Your Honor. Testimony first. Harris and Cormier, grand jury. First, before the government has the computer, Cormier and Harris lie to the grand jury. Second, the government seizes Johnston's computer at work. Correct. Third, the government gets a search warrant. Fourth, the government scans the hard drive for Abood, and they don't find the e-mail that shows that Harris and Cormier lied to the grand jury. Correct. Fifth, the government learns at trial from the defense's tremendously capable cross that Cormier and Harris have been lying. Have I got the time sequence? Correct. Okay. Now, show me why that doesn't show empty head and no misconduct. I'm not arguing, Brady, violation. I'm arguing that inherent – You are arguing prosecutorial misconduct. I'm arguing a hybrid. And if we need to park this car somewhere, we're going to have to park it in Judge Otero's courtroom, I am sorry to say, because Judge Otero spent hours thinking and talking and discussing and colloquies and more than colloquies with the government attorneys while we all sat there outside the jury's presence while he tried to – he wrangled with this issue over and over and over again, and it's in the excerpt and it's in our brief, and it's undisputed. At the end of the day, what he said to us, the defense, in denying the motion to dismiss was, I have no case law. This case is for another court for another day, and in my brief, I say that day has come. We cannot look away. We don't even have to give a label to what happened here. Look away from what? What's the misconduct? We don't have to say it's misconduct. We don't have to. My position is we say he doesn't need – the judge doesn't need misconduct to exercise his or her inherent supervisory power. He has three different ways to do that, and the most important one to this case, the most relevant one to this case, keeping all parties out of what happened here but just accepting that what happened happened was not justice, is that – Why isn't it justice? It sounds like the guy was guilty. He got convicted. Part of the process of getting him convicted was some of the government's witnesses were just bald-faced liars to the grand jury. It talks about, Your Honor – But I don't understand what – It talks about the integrity of judicial proceedings, United States v. Miller. It talks about where defendants' rights have been violated or where the integrity of judicial proceedings have otherwise been compromised. You can't talk that fast. It just flies over. I'm sorry, Your Honor. Calm down. What I'm focusing on is the integrity of judicial proceedings, not the weight of the evidence. We didn't argue there was insufficient evidence here. We argued that based upon what happened here. I understand the integrity of the judicial proceedings. We occasionally get those cases where at the end of it all, everything was so phony and there were so many lies you can't tell what happened. You are left without any confidence in the verdict. But I don't understand why this is such a case. Because by immunizing this witness, first of all, by even calling this witness when they didn't need him, they did not need him. They had Tracy Cormier. The government repeatedly tried to put the burden on the defense and on the judge. Well, Ms. Cormier is still available. Bring her in if you have more questions. The judge accused the government of not asking complete questions of Rex Harris to get out the real truth they claimed they wanted the jury to know. He accused them of that. Their response was, well, you can ask him yourself. And he said, the judge, rightfully so, it is not my job, nor is it the defense's job, to do your job, which is to ask these important, pointed questions. Judge Otero repeatedly accused the government of duplicity. He did. Through hours and hours of colloquies and days after days when they go back up and not dismiss, come down, he basically pleaded with them to dismiss these counts because what he found in his experience of 21 years was it was not justice, that he said despite the apparent guilt from the evidence that had come in prior to Cormier and Harris that this was not justice, that that is a secondary thing. And this morning Judge Pragerson talked about how, you know, in the first case that was up to the podium, about how, you know, these clients are bad people, but they still deserve a fair trial. Mr. Johnson did not get a fair trial on counts 26 and 27. Thank you. Okay. Thank you very much.
judges: Pregerson, Kleinfeld, Nguyen